**John DOES 1, 2, 3, and 4, Plaintiffs,**

v.

**THE COVINGTON COUNTY SCHOOL BOARD, et al., Defendants.**

**Civil Action No. 94–D–440–N.**

United States District Court,
M.D. Alabama,
Northern Division.

Feb. 4, 1997.

As Amended Feb. 4, 1997.

1266

Stanley J. Murphy, Marita K. Murphy, Tuscaloosa, AL, David Leon Ashford, Birmingham, AL, for Plaintiffs.

Allen G. Woodard, Andalusia, AL, Mark S. Boardman, Clay R. Carr, Birmingham, AL, for Defendants.

*MEMORANDUM OPINION AND ORDER*

DE MENT, District Judge.

On May 10, 1996, the Court entered an Order addressing defendants' motion for summary judgment and subsequent related filings. *John Does 1, 2, 3, 4 v. Covington County Sch. Bd. of Educ.*, 930 F.Supp. 554 (M.D.Ala.1996) [hereinafter *Does I*]. In *Does I* the Court reserved ruling on the following issues: (1) the plaintiffs' claim that defendants created a sexually hostile education environment in violation of Title IX of the Education Amendments of 1972, §§ 901–909, as amended, 20 U.S.C. 5 § 1681–1688; (2) the plaintiffs' claim that defendants failed to comply with Title IX requirements pertaining to the adoption and publication of procedures for receiving and investigating complaints of sex discrimination; and (3) the defendants' claim that they are shielded by the doctrine of discretionary immunity from the plaintiffs' state law claims. *Id.* at 580. Since *Does I* the parties have further briefed and submitted evidence in support of their respective positions on these remaining issues. The Court will first address the plaintiffs' claims pertaining to Title IX and then turn to the plaintiffs' state law claims.

**BACKGROUND**

The Court will provide a brief synopsis of the facts and history of the case up to this point. The plaintiffs are male children who attended W.S. Harlan Elementary School in Lockhart, Alabama. The plaintiffs contend that while they were students at W.S. Harlan they were sexually harassed and abused by a male third grade teacher, Michael Smith ("Smith").[1] The defendants in this case are the Covington County School Board of Education ("Board"); the five members of the Board, sued individually and in their official capacities; Terry Holley, sued individually and in his official capacity as Principal of the W.S. Harlan Elementary School; and Dale Odom, sued individually and in his official capacity as Superintendent of Education for Covington County, Alabama. The plaintiffs contend that the defendants are liable for the injuries they suffered at the hands of Smith.

The plaintiffs filed a three count complaint. Count I states a claim under 42 U.S.C. § 1983.[2] In Count II, plaintiffs allege claims pursuant to Title IX.[3] In Count III, plaintiffs originally alleged four state causes of action: (1) sexual abuse and harassment, (2) outrage, (3) negligence, and (4) sexual assault. Plaintiffs subsequently amended Count III of their complaint to allege an additional state law cause of action, fraud and bad faith.

**I. TITLE IX**

■ At the outset, the Court will address defendants' contention that plaintiffs' Title IX claims against the Board are barred by the Eleventh Amendment. The defendants assert that the United States Supreme Court's decision in *Seminole Tribe of Florida v. Florida*, —— U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), mandates that this Court reconsider its previous finding that the Board was not entitled to Eleventh

---

1. Smith was indicted in Florida and Alabama for sexually abusing Does 1, 2, 3, and another child, not a party to this action. In January 1995, Smith was convicted in the 1st Judicial Circuit, Walton County, FL, of multiple counts of sexual battery and assault upon a child. Smith's conviction was for the abuse of Doe 1 and the non-party child. The state attorney chose not to prosecute Smith for the alleged abuse of Does 2 and 3 in light of Smith's conviction and life sentence for abusing Doe 1 and the non-party child. The Alabama authorities have agreed to defer to the Florida criminal prosecution.

2. In *Does I* the Court found that plaintiffs had two claims under § 1983: first, that defendants had violated plaintiffs' substantive due process rights of personal safety, security and privacy guaranteed by the Fourteenth Amendment to the Constitution, and second, that defendants had infringed upon plaintiffs' rights as guaranteed by Title IX. 930 F.Supp. at 572–74. The Court dismissed the § 1983 claims founded on plaintiffs' Title IX rights. *Id.* With respect to the substantive due process claim, the Court found that the defendants, in their individual capacities, had qualified immunity. *Id.* at 575–77. Thus, plaintiffs still have pending a § 1983 substantive due process claim against defendants in their official capacities.

3. In *Does I* the Court found that a Title IX claim is only viable against an institutional defendant, and thus, the plaintiffs could maintain their Title IX claims only against the Board. 930 F.Supp. at 566.

Amendment immunity.[4] *Seminole Tribe* raises a question as to whether Congress had the power to abrogate states' Eleventh Amendment immunity for claims brought under Title IX. See 42 U.S.C. § 2000d–7(a)(1) ("[a] state shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal Court for a violation of ... Title IX of the Education Amendments of 1972"). However, the defendants' argument is foreclosed by *Stewart v. Baldwin County Bd. of Educ.*, 908 F.2d 1499, (11th Cir.1990), in which the Court of Appeals for the Eleventh Circuit held that under Alabama law, a county board of education is "not an 'arm of the state' for purposes of Eleventh Amendment immunity." *Id.* at 1511.[5] Therefore, *Seminole Tribe* is inapposite to the instant case; the defendants do not have Eleventh Amendment Immunity.

## Board Compliance with Title IX Regulations

In *Does I* the Court directed the parties to submit evidence on whether the Board has complied with the regulations implementing Title IX, specifically 34 C.F.R. §§ 106.8 and 106.9. In brief, these regulations require that educational institutions receiving federal financing (1) designate someone to oversee compliance with Title IX; (2) adopt and publish a grievance procedure; and (3) provide notice of their intent not to discriminate on the basis of sex.

Before discussing the particularities of the Board's compliance or non-compliance with these regulations, the Court must examine the relevance of this entire line of inquiry. Defendants assert that, even if they are not in compliance with Title IX's implementing regulations, such failure to comply does not create a cause of action for the plaintiffs. Plaintiffs, on the other hand, appear to contend that defendants' compliance with Title IX is both relevant to plaintiffs' substantive sexual harassment claims and the basis for a wholly independent claim.

▆▆▆▆ In support of their position, defendants cite *Seamons v. Snow*, 84 F.3d 1226 (10th Cir.1996). The *Seamons* Court stated:

[the plaintiff's] claim that the school district discriminated based on sex because it failed to provide Title IX grievance procedures to the students is insufficient to state a claim here because the school district's alleged failure to adopt Title IX's grievance policy and procedures was not itself an act of discrimination based on sex.

84 F.3d at 1233. Similarly, in *Bougher v. University of Pittsburgh*, 713 F.Supp. 139 (W.D.Pa.1989), *aff'd* 882 F.2d 74 (3d Cir. 1989), the court found that simply alleging that a university did not have a grievance procedure in place was not sufficient to state a claim for relief. 713 F.Supp. at 145. The

4. In *Seminole Tribe*, the Supreme Court overruled *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), and held that Congress cannot abrogate a state's Eleventh Amendment immunity unless it acts pursuant to § 5 of the Fourteenth Amendment. *See* ── U.S. at ──–──, 116 S.Ct. at 1125–32. The defendants contend that Title IX was enacted pursuant to the spending clause in Article I, Section 8 of the Constitution, *see Rowinsky v. Bryan Indep. Sch. Dist.*, 80 F.3d 1006 (5th Cir.1996), *cert. denied* ── U.S. ──, 117 S.Ct. 165, 136 L.Ed.2d 108 (1996), and therefore, Congress' attempt to abrogate states' Eleventh Amendment immunity for, inter alia, Title IX actions, *see* 42 U.S.C. § 2000d–7, was ineffective. While defendants have made a cogent argument, the Court cannot reach this issue because, as discussed below, the Board is not an arm of the state for the purposes of Eleventh Amendment immunity.

5. In *Stewart*, the court, relying on *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), observed that whether a local school board is protected by Eleventh Amendment immunity depends on whether the school board is properly classified as "an arm of the state." 908 F.Supp. at 1509. The court went on to state that "the ultimate question of whether the state is the 'real party in interest' is one of federal law, not state law." *Id.* (citing *Howlett v. Rose*, 496 U.S. 356, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990)). However, the defendants argue that *Seminole Tribe* stands for the further proposition that, a state entity's status, for purposes of Eleventh Amendment immunity analysis (i.e. whether an entity is or is not an "arm" of the state), is controlled by state law rather than federal law. The Court does not read *Seminole Tribe* to support defendants' contention. The Court will not diverge from controlling precedent absent a clear invitation from the Eleventh Circuit or Supreme Court.

reasoning used by these courts is similar. Both courts proceed from the presumption that, to state a claim under Title IX, a plaintiff must allege that he or she was discriminated against on the basis of sex. *Seamons,* 84 F.3d at 1232; *Bougher,* 713 F.Supp. at 143–44. After examining the plaintiffs' factual allegations, the courts concluded that the plaintiffs had not made out prima facie cases of sex discrimination, i.e., that the facts did not support an inference that the plaintiffs had been discriminated against on the basis of sex. *Seamons,* 84 F.3d at 1232–33; *Bougher,* 713 F.Supp. at 143–44. Turning then to the plaintiffs' allegations that the respective educational institutions were not in compliance with Title IX's procedural requirements, the courts held that compliance or non-compliance was not, unto itself, a discriminatory act, and thus, plaintiffs either had no standing to bring such a procedural challenge or had failed to state a claim for relief. *Seamons,* 84 F.3d at 1233; *Bougher,* 713 F.Supp. at 145.

■ The Court finds such reasoning persuasive. In *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), the Supreme Court first recognized that Title IX contains an implied private cause of action. The Court, after reviewing the statutory language and legislative history of Title IX, held that Congress had intended private litigants to have a cause of action to enforce their Title IX statutory rights. *Id.* at 688–718, 99 S.Ct. at 1953–68. Title IX provides in pertinent part:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . .

20 U.S.C. § 1681(a). Thus, the statutory right conferred by Title IX is the right to be free from discrimination on the basis of sex. Hence, it follows logically that, to maintain a cause of action under Title IX, a plaintiff must allege facts which demonstrate he or she was discriminated against on the basis of sex. An institution's failure to comply with a procedural regulation, such as the failure to promulgate a grievance procedure, is not an action which discriminates on the basis of sex. Accordingly, the Court finds that defendants' failure to comply with Title IX's procedural requirements, alone, does not provide plaintiffs with a claim for relief.[6]

This does not mean, however, that the regulations are completely irrelevant to plaintiffs' cause of action. If the Board failed to comply with the regulations, the Court must consider what effect this failure had on plaintiffs' substantive Title IX rights. The Court will take this issue up in its discussion of plaintiffs' substantive Title IX claims.

Returning to the issue of the Board's compliance, the Court will first identify what the Title IX regulations require. Specifically, 34 C.F.R. § 106.8(b) states:

*Complaint procedure of recipient.* A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action that would be prohibited by this part.

(emphasis in original). The plaintiffs contend that defendants have not complied with § 106.8(b) in that, at the time the plaintiffs were sexually abused, the Board had no specific policy against sexual harassment and the Board's general grievance policy was insufficient. Additionally, plaintiffs contend that these policies were not published in accordance with §§ 106.8 and 106.9.

■ The standard governing this inquiry is whether the Board took action which sufficiently informed employees and students of

---

**6.** The plaintiffs assert that prior to *Franklin v. Gwinnett County Public Schs.,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), in which the Supreme Court held that a private Title IX litigant could seek a damage remedy, litigants frequently sought judicial determination that recipients of federal funds were in noncompliance with the procedural requirements of Title IX and its regulations. However, plaintiffs fail to cite any cases in support of this proposition. The Court can find no case in which the violation of a Title IX procedural requirement created a cause of action for a private litigant. Cf. *Minor v. Northville Public Schs.,* 605 F.Supp. 1185, 1197–99 (E.D.Mich.1985) (finding that Title IX regulation requiring completion of compliance certificate does not give plaintiff a substantive right).

their Title IX rights, and whether the Board had in place procedures sufficient to allow for the "prompt and equitable resolution of student and employee complaints" alleging violations of their Title IX rights. 34 C.F.R. 106.8(b). After reviewing all the evidence submitted by the parties, the Court finds that there is a material issue of fact as to whether the Board complied with 106.8 and 106.9. Although the defendants claim to have had a grievance policy in place since 1976, the plaintiffs have presented evidence calling into question the sufficiency of defendants' "general" grievance policy. Furthermore, plaintiffs have produced evidence which raises questions as to whether defendants adequately published their grievance policy. Finally, plaintiffs' evidence raises questions about whether the procedures adopted by defendants lead to the "equitable resolution" of student and employee complaints, once received. Therefore, the Court finds that the Board may have been in non-compliance with the Title IX implementing regulations at the time plaintiffs were injured.

### Sexual Harassment

In Count II of their complaint (the Title IX cause of action) the plaintiffs allege: "The sexual abuse and harassment suffered by the plaintiffs at the hands of an agent of the board, has the effect of denying to the plaintiffs the benefits of the educational programs operated by the board." Compl. ¶ 25. In *Does I*, the Court interpreted this general allegation as a claim for recovery under a sexually hostile education environment theory.[7] The Court recognized that there are two distinct types of sexual harassment, quid pro quo and hostile work environment, but found that because the plaintiffs had not alleged facts that Smith either implicitly or explicitly conditioned the Does' academic achievement on submission to his sexual advances, the quid pro quo theory was inapplicable. 930 F.Supp. at 569, n. 11.

Following *Does I* both the plaintiffs and defendants made substantial proffers of evi-

dence and submitted briefs clarifying their positions on the outstanding issues. From a review of plaintiffs' brief submitted June 3, 1996, it is clear that, in fact, plaintiffs seek to recover under Title IX through three theories of sexual harassment. Plaintiffs assert that they are entitled to recovery under (1) a student-teacher sexually hostile education environment theory; (2) a student-student (peer to peer) sexually hostile education environment theory; and (3) a quid pro quo theory of sexual harassment. Defendants contend that plaintiffs may recover only under the student-teacher hostile environment claim because plaintiffs failed to allege facts supporting either of plaintiffs' other theories and because plaintiffs are bound by the Court's finding in *Does I* that the quid pro quo theory of sexual harassment is inapplicable to the facts of this case.

### A. Quid Pro Quo Harassment

■■ Turning first to the Court's finding in *Does I* that the quid pro quo theory was inapplicable, the Court notes that its finding was premised upon the absence of evidence to support recovery under the quid pro quo theory of sexual harassment. In *Henson v. City of Dundee*, 682 F.2d 897 (11th Cir.1982), the Court of Appeals distinguished the quid pro quo and hostile environment theories of sexual harassment. Unlike a claim under a hostile environment theory, to maintain an action for quid pro quo sexual harassment, "[t]he acceptance or rejection of the harassment by an employee must be an express or implied condition to the receipt of a job benefit or the cause of a tangible job detriment." *Id.* at 909. To maintain a quid pro quo claim in the context of Title IX, plaintiffs must allege that their academic advancement was conditioned upon submission to sexual demands. See *Alexander v. Yale Univ.*, 459 F.Supp. 1, 4 (D.Conn.1977), *aff'd* 631 F.2d 178 (2d Cir.1980).

Because, at the time *Does I* was written, plaintiffs had not alleged or produced any evidence of a link between plaintiffs' schooling and Smith's sexual advances, the Court appropriately concluded that the quid pro

---

**7.** The Court found that plaintiffs' references to sexual abuse and harassment in the complaint and briefs put defendants on notice of plaintiffs'

intent to seek recovery under a hostile environment theory. 930 F.Supp. at 568.

quo theory was inapplicable. *See Saville v. Houston County Healthcare Authority*, 852 F.Supp. 1512, 1527 (M.D.Ala.1994) (finding quid pro quo theory viable where there was evidence sufficient to create inference of causal link between deterioration in clinical evaluations and student's refusal to submit to sexual advances of professor). However, in their evidentiary submission following *Does I*, the plaintiffs produced evidence of this previously absent causal link. Thus, the question for the Court is whether plaintiffs' failure to explicitly allege or produce such evidence prior to their June 3, 1996, submission should bar plaintiffs' quid pro quo claim; the Court finds that it should not.

■■■■ The Court finds that the defendants will not be unduly prejudiced by recognizing plaintiffs' quid pro quo claim. Under Rule 8 of the Federal Rules of Civil Procedure a plaintiff must make a "short and plain statement" of the grounds for his or her claim. To satisfy Rule 8's liberal pleading requirements, a plaintiff need only "provide a general summary of the party's position that is sufficient to advise the other party of the event being sued upon." 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1202 (1990). Here, plaintiffs' quid pro quo sexual harassment claims arise out of the same factual events which support their hostile environment claims. Further, the Court finds that the complaint was not devoid of allegations which could support plaintiffs' claims under a quid pro quo theory.

■■■■ In paragraph ten, plaintiffs allege:

This harassment and abuse occurred both while the plaintiffs were under the direct supervision of the teacher in his class; on occasions in which the students were sent by other teachers to the classroom of the abuser; and on school trips and programs in which the teacher was given supervisory authority over students from different classrooms and different grades.

The Court finds that this allegation is sufficient to put the defendants on notice of a possible link between Smith's authority as a teacher and his sexual abuse of the plaintiffs. Further, the Court finds that the defendants were in receipt of evidence, well before plaintiffs' June 3, 1996 submission, which lends support to plaintiffs' claims of quid pro quo sexual harassment. In a deposition of John Doe 1 taken by the defendants on October 10, 1994, the following was stated:

Q. Do you know how he got his hand inside your pants?

A. No, ma'am

Q. Where did this happen at school?

A. In his classroom.

Q. Where were you in the classroom?

A. Behind his podium.

Q. Okay. What were you doing at the podium?

A. He, I was like a teacher's pet or something. He always called me up there.

Q. Okay. What kind of things would you do when you got up there?

A. Like he would let me copy the answers off his book, out of his book and stuff.

Dep. of John Doe 1 at 75–76. The Court finds that, in the context of an elementary school setting, these statements are sufficient to support an inference of quid pro quo sexual harassment.

Finally, the Court notes that the defendants, in response to plaintiffs' June 3, 1996 submission, offered no explanation as to why they would be prejudiced if the plaintiffs were permitted to proceed under a quid pro quo theory of liability. Defendants did not claim that allowing plaintiffs to proceed under this theory would necessitate additional discovery or otherwise cause delay. Rather, defendants rely on this Court's statement in *Does I* that the quid pro quo theory is inapplicable and further assert that the plaintiffs have offered no evidence which could support a quid pro quo theory of recovery. But, as the Court has pointed out above, there is, in fact, evidence which supports plaintiffs' quid pro quo claim. Consequently, the Court finds that the interests of justice would best be served by allowing the plaintiffs to seek recovery under a quid pro quo theory of sexual harassment.

However, this finding does not mean that each of the Does has a viable quid pro quo claim. Each Doe must, individually, produce evidence sufficient to establish the prima facie elements announced in *Henson, supra.*[8] These elements are: (1) the student belongs to a protected group; (2) the student is subjected to unwelcome harassment; (3) the harassment complained of is based upon sex; (4) the acceptance or rejection of the harassment by the student is an express or implied condition of the student's academic advancement; and (5) respondeat superior. *See Henson,* 682 F.2d at 909. However, in quid pro quo sexual harassment cases this fifth element is presumed; the employer, the Board here, is strictly liable for Smith's conduct. *See id.* at 910; *Kadiki v. Virginia Commonwealth Univ.,* 892 F.Supp. 746, 751 (E.D.Va.1995).

As noted above, Does 1 has produced evidence sufficient to raise a factual question as to whether there was a nexus between his school performance and Smith's sexual abuse. The Court in *Does I* found that all of the plaintiffs are members of a protected group. 930 F.Supp. at 569. When dealing with the sexual abuse of elementary students, it may be presumed that the abuse is unwelcome. Finally, it is clear that here, the abuse was based on the Does' sex. In fact, each of the Does has satisfied the first three elements of their prima facie cases. As Doe 1 has also satisfied the fourth element, the Court finds that Doe 1 has establish a prima facie case of quid pro quo sexual harassment.

Doe 3 has also presented evidence sufficient to establish his prima facie case. Doe 3's mother offered the following testimony:

Because [Doe 3] was a student in Smith's class, Smith was able to "reward" and "punish" him with school work. For instance, [Doe 3] was allowed to make very good grades without the required schoolwork. He was given A's on his report card without doing the homework, classwork or taking tests that were required of the other students in [Doe 3's] class. I know this because [Doe 3] told me. [Doe 3's] grades fell considerably after the arrest of Michael Smith. The teacher who replaced Michael Smith, Molly Ellisor, called me for a conference and was concerned that [Doe 3's] record of excellent grades in Michael Smith's gradebook were inconsistent with [Doe 3's] understanding of the subject. It was clear to me, as [Doe 3's] mother, that Smith was using the reward of good grades to assist him in the abuse of my son. My son had excellent grades in Michael Smith's classroom. When Molly Ellisor replaced Michael Smith, my son received mediocre and worse grades. When my son entered into the fourth grade, he received failing grades. [Doe 3] failed the fourth grade and had to repeat it the next year.

In my judgment, some of [Doe 3's] academic trouble after Michael Smith's arrest was caused by the abuse itself. However, even without that trauma, [Doe 3] was not prepared for the actual schoolwork he was required to do by his subsequent teachers.

Ex. T of Pl.'s June 3, 1996 submission.[9] Although more tenuous than a statement from Doe 3 himself,[10] the Court finds that this

---

8. Although *Davis v. Monroe County Bd. of Educ.,* 74 F.3d 1186 (11th Cir.1996), the seminal case on Title IX analysis in the Eleventh Circuit, has been vacated, 91 F.3d 1418 (1996), federal courts are virtually unanimous that plaintiffs' quid pro quo sexual harassment claims should be reviewed through the application of a Title VII framework. *See e.g. Bruneau v. South Kortright Central Sch. Dist.,* 935 F.Supp. 162, 170 (N.D.N.Y.1996) (listing courts that have applied Title VII analysis to Title IX claim); *Patricia H. v. Berkeley Unified Sch. Dist.,* 830 F.Supp. 1288, 1290 (N.D.Cal.1993) ("The entire legal theory of sexual harassment has been developed in the context of Title VII.").

9. The Court finds that the statement concerning what Doe 3 told his mother is not hearsay as it is offered not for the truth of the matter asserted, but for the belief or thought process of Doe 3 during the period in which Smith abused him. *See* Rule 801(c) Federal Rules of Evidence.

10. Because of the Does' age and the traumatic nature of this case, the Court has a relaxed expectation of the type and extent of testimony it will receive from the Does themselves. This is not to say that the Court will apply a lesser substantive legal standard to the Does' claims. Rather, the Court will carefully consider all the evidence which supports the Does' claims, keeping in mind that the Does themselves are unlikely

statement is sufficient to support an inference of quid pro quo sexual harassment. Therefore, the Court finds that Doe 3 has established his prima facie case.

 Does 2 and 4 have not offered evidence sufficient to meet the fourth element of their prima facie case. Neither Doe 2 nor 4 was a student in Smith's class. Thus, any influence Smith could have on these Does' academic performance would be indirect at best. There is no testimony, from Does 2 and 4 or anybody else, from which a reasonable person could conclude that Does' 2 and 4 academic performance was in any way related to Smith's sexual abuse.[11] Accordingly, to the extent Does 2 and 4 seek to bring a claim for quid pro quo sexual harassment, summary judgment is due to be granted for the defendants.

### B. Peer to Peer Hostile Environment

 Turning next to the plaintiffs' claims under a peer to peer hostile environment theory, the Court finds that allowing plaintiffs to proceed under this theory will not unduly prejudice the defendants. Although the plaintiffs may not have used the term "peer to peer" hostile environment, it is clear that, from the outset, plaintiffs have sought recovery for the harassment the Does suffered following Smith's arrest. In their complaint plaintiffs allege:

> After the public disclosure of the incidents of sexual abuse and harassment suffered by the plaintiffs, neither the board, the principal nor any of their agents has taken any significant or appropriate action to investigate the facts of this matter; to counsel with the injured students or their families; to attend to even the most rudimentary counseling by the plaintiffs *on account of the reactions of their peers to the actions giving rise to their complaints.*

Compl. ¶ 15. (emphasis added). The Court finds that this allegation and the references in plaintiffs' briefs to the post-arrest environment in the school are sufficient to have put

defendants on notice that plaintiffs would seek recovery under a peer to peer sexual harassment theory.

Of course, the fact that plaintiffs have attempted to state a claim for peer to peer sexual harassment is irrelevant if such a claim is not a viable cause of action in the Eleventh Circuit. The Eleventh Circuit's decision to vacate *Davis v. Monroe County Bd. of Educ.*, 74 F.3d 1186 (11th Cir.1996), *vacated*, 91 F.3d 1418 (1996), leaves open the question of whether such a cause should be recognized.

 In *Rowinsky v. Bryan Indep. Sch. Dist.*, 80 F.3d 1006 (5th Cir.1996), the Fifth Circuit declined to recognize a cause of action for peer to peer sexual harassment under Title IX. *Rowinsky* was decided subsequent to *Davis*, and the *Rowinsky* Court noted its express disagreement with the *Davis* Court's decision. 80 F.3d at 1010 n. 8. Notably, the *Rowinsky* Court appeared to reject the application of Title VII standards to the analysis of a Title IX claim. *See id.* at 1011 n. 11.

The *Rowinsky* Court first examined the statutory language of Title IX and concluded it was ambiguous. *Id.* at 1011–12 ("[T]he prohibition on sex discrimination, ... taken in isolation, is not explicitly limited to the acts of grant recipients .... on the other hand, the open-ended language of Title IX does not support an inference that the statute applies to the conduct of third parties."). After concluding that Title IX was enacted pursuant to Congress' spending power, the court reasoned that Title IX was not intended to encompass a peer-created hostile environment claim because Congress was unlikely to condition the receipt of federal monies on the discriminatory acts of third parties. *Id.* at 1012–13. The Court stated, "While it is plausible that the condition imposed could encompass ending discriminatory behavior by third parties, the more probable inference is that the condition prohibits certain behavior by the grant recipients themselves." *Id.*

---

to offer testimony in support of their claims in the same manner and to the same extent that an adult victim of sexual harassment could.

**11.** The Court finds that the testimony of Doe 4 to the effect that, on one occasion Smith helped or tutored him with his homework, is not sufficient to establish the fourth element of Doe 4's prima facie case. *See* Dep. of Doe 4 at 130–33.

at 1013. The court went on to find that both the structure of the statute and the legislative history favored this narrow reading of Title IX. *Id.* at 1013–14. In the *Rowinsky* Court's opinion, the mere fact that an educational institution tolerates an environment of sexual harassment does not violate the mandate of Title IX; rather, "a school district might violate Title IX if it treated sexual harassment of boys more seriously than sexual harassment of girls, or even if it turned a blind eye toward sexual harassment of girls while addressing assaults that harmed boys." *Id.* at 1016.

This Court has difficulty squaring the *Rowinsky* Court's reading of Title IX with the Supreme Court's command to "accord [Title IX] a sweep as broad as its language." *North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 521, 102 S.Ct. 1912, 1918, 72 L.Ed.2d 299 (1982) (citations omitted). It would be odd if the Court were to construe a statute intended to "provide individual citizens effective protection against [discrimination]," *Cannon,* 441 U.S. at 704, 99 S.Ct. at 1961, and to be interpreted broadly, *North Haven, supra,* as giving schoolchildren, who are committed to the care and must exist within the environment of our educational institutions, less protection than that afforded employees in the workplace. *Davis,* 74 F.3d at 1192–93 (citing *Franklin v. Gwinnett County Public Schs.,* 503 U.S. 60, 73–75, 112 S.Ct. 1028, 1037, 117 L.Ed.2d 208 (1992)). Further, the Court finds the *Rowinsky* Court's reasoning unpersuasive. The *Rowinsky* Court apparently believed that recognizing a peer created hostile environment claim would open up the floodgates of liability for educational institutions such that these institutions "would be induced to turn down [federal financial assistance]." 80 F.3d at 1013. These fears are unfounded. Even under a "liberal" Title VII standard of institutional liability, a school can only be held liable if it "fails to take prompt remedial action after receiving notice of the alleged sexual harassment." *Kilgore v. Thompson & Brock Management, Inc.,* 93 F.3d 752, 754 (11th Cir.1996). Thus, it is not a third party's act of harassment which triggers liability, it is the educational institution's knowing tolerance which gives rise to a peer-created hostile environment action.

█ Furthermore, the Court disagrees with the *Rowinsky* Court's assessment of when an educational institution may be charged with "sex discrimination." The Court does not believe that a plaintiff must demonstrate that an educational institution reacted less favorably to the complaints of one sex to demonstrate that the institution has engaged in sex discrimination. While the Court agrees that "[t]he mere existence of sexual harassment does not necessarily constitute sexual discrimination," *Rowinsky,* 80 F.3d at 1016, the *knowing tolerance* of sexual harassment may indeed constitute sexual discrimination. "Sexual harassment" is necessarily "based on sex." The "based on sex" element distinguishes "sexual harassment" from plain "harassment." The Supreme Court has held that the knowing tolerance of sexual harassment may create a hostile environment. *See Meritor Savings Bank v. Vinson,* 477 U.S. 57, 66–67, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986). A Title VII plaintiff may recover compensatory and punitive damages if he or she is injured by the creation of a hostile environment. *See Landgraf v. USI Film Products,* 511 U.S. 244, 281–83, 114 S.Ct. 1483, 1506, 128 L.Ed.2d 229 (1994) (42 U.S.C. § 1981a(a)(1) "confers a new right to monetary relief on persons like petitioner who were victims of a hostile work environment"). A Title VII plaintiff may recover compensatory and punitive damages only if he or she demonstrates intentional discrimination. *See* 42 U.S.C. § 1981a(a)(1). Therefore, the knowing tolerance of sexual harassment, connotes intentional discrimination based on sex.

█ The majority of the courts that have confronted the question of whether to recognize a peer created hostile environment claim under Title IX have decided that such a claim is viable. *See e.g. Bruneau v. South Kortright Central Sch. Dist.,* 935 F.Supp. 162 (N.D.N.Y.1996); *Oona R.–S. by Kate S. v. Santa Rosa City Schs.,* 890 F.Supp. 1452 (N.D.Cal.1995); *Burrow v. Postville Community Sch. Dist.,* 929 F.Supp. 1193 (N.D.Iowa 1996). Assuming arguendo that such a claim is viable in the Eleventh Circuit, the plaintiffs cannot go forward with this claim unless

they have produced evidence sufficient to establish a prima facie case. The courts that have recognized a peer to peer sexual harassment cause of action under Title IX (including the now vacated decision in *Davis* ) agree on the first four elements of plaintiffs' prima facie case. The plaintiffs must establish that: (1) they belong to a protected group; (2) they were the subject to unwelcome harassment; (3) the harassment was based on the plaintiffs' sex; and (4) the harassment was so severe or pervasive that it altered the conditions of their education and created an abusive education environment. *See e.g. Davis,* 74 F.3d at 1194; *Wright v. Mason City Community Sch. Dist.,* 940 F.Supp. 1412 (N.D.Iowa 1996); *Bruneau, supra; Kate, supra.*

The testimony which might support plaintiffs' peer to peer harassment claim indicates that plaintiffs were teased and harassed because the harassers believed the plaintiffs had been sexually molested by Smith. For example, Doe 1 testified:

A. Kids would pick on me and stuff.

\* \* \*

Q. What do you mean when you say they would pick on you?

A. They would, like, they would just talk about me, like about Mr. Smith and stuff.

\* \* \*

A. He would just say stuff like Smith's boy.

Dep. of Doe 1 at 125–27. Another boy called Doe 1 "gay." *Id.* at 135. Doe 2 testified:

Q. What kind of things would they pick on you for?

A. About Mr. Smith.

\* \* \*

Q. When you say they would pick on you, what do you mean?

A. Saying that, saying I got messed with by Mr. Smith.

\* \* \*

Q. Okay. Tell me what happened when they started picking on you.

A. They said Mr. Smith touched me, that he molested me and everything.

Dep. of Doe 2 at 77–78, 91. The parent of Doe 3 claimed her child's peers called him names such as "fag," "gay" and "Smith's boy." Ex. X attached to Pl.'s June 3, 1996, Br. at 116, 127. The parent of Doe 4 stated that Doe 4's peers were calling him names. Ex. Z attached to Pl.'s June 3, 1996, Br. at 39. He described an incident on the bus where Doe 4's peers "pulled him to the back of the bus and wrote on his arm I am Mr. Smith's friend.'" *Id.* at 40.

The Court's earlier finding, that the Does are members of a protected group, applies here. Also, it is clear to the Court that the harassment was unwelcome. The third element of plaintiffs' prima facie case is that the harassment must be "based on the plaintiffs' sex." To demonstrate that harassment is based upon the plaintiffs' sex, plaintiffs must show that, but for the fact of their sex, they would not have been harassed. *Dundee,* 682 F.2d at 904. Plaintiffs argue that the nature of the abuse they suffered at the hands of Smith and the fact that Smith's victims were all male children, satisfy this third element. Pl.'s June 3, 1996 Br. at 41. While the Court agrees that Smith's harassment of the plaintiffs was based upon the plaintiffs' sex, it does not follow that the peer harassment suffered by the plaintiffs was necessarily based upon the plaintiffs' sex.

In *Wright, supra,* the plaintiff was harassed by her fellow students because she pressed rape charges against her ex-boyfriend. 940 F.Supp. at 1414. The students called the plaintiff names and physically assaulted her. *Id.* This harassment was sufficient to create a jury issue over whether the plaintiff had been harassed because of her sex. In *Burrow v. Postville Community Sch. Dist.,* 929 F.Supp. 1193 (N.D.Iowa 1996), the plaintiff "turned in" a number of her classmates for having caused property damage at a party which took place at plaintiff's house. *Id.* at 1196. In response, plaintiff's peers subjected her to extensive physical and verbal abuse with strong sexual overtones. *Id.* The court stated the plaintiff's peers "arguably went beyond harassing her for 'betraying' certain students." *Id.* at 1206. The court found that the plaintiff had created a jury question over whether she was harassed on the basis of her sex. *Id.* In *Bruneau, supra,* the court recognized that name calling

and even physical contact of a sexual nature, when perpetrated by young children, is not necessarily based on the harassee's sex. See 935 F.Supp. at 175. Nevertheless, the court held that the issue was one to be decided by the jury. *Id.*

Here, the Court finds that, from the evidence presented by the plaintiffs, a reasonable person could infer that the Does were harassed on the basis of their sex. The comments of the Does' peers clearly stem from the sexual abuse suffered by the Does. This abuse was based on the Does' sex. The Court, however, cannot say whether the plaintiffs' peers were simply acting out of childish cruelty or whether the plaintiffs' sex was the but-for cause of the harassment. Under these circumstances, the Court cannot, as a matter of law, conclude that the peer harassment was not based on the Does' sex. Cf. *Seamons v. Snow,* 84 F.3d 1226, 1232–33 (10th Cir.1996) (concluding that peer harassment was not based on the plaintiff's sex); *Martin v. Norfolk Southern Ry. Co.,* 926 F.Supp. 1044, 1049–50 (N.D.Ala.1996) (concluding, in Title VII case, that harassment is not "based on sex" when harassment occurs between heterosexual members of the same sex).

■■■■■ In addition to proving that the harassment was based on the plaintiffs' sex, the plaintiffs must show that the peer harassment was so severe and/or pervasive that, under the totality of the circumstances, the harassment subjectively and objectively created a hostile or abusive education environment. See *Harris v. Forklift Sys. Inc.,* 510 U.S. 17, 20–24, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295 (1993); *Davis,* 74 F.3d at 1194; *Henson,* 682 F.2d at 904. A hostile environment may not be created by "simple childish behavior or by an offensive utterance, comment, or vulgarity." *Davis,* 74 F.3d at 1194. While there is no mathematical formula to guide this decision, the Supreme Court in *Harris* noted that the following factors may assist courts in their determination: (1) the frequency of the discriminatory conduct; (2)

its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. 510 U.S. at 22–23, 114 S.Ct. at 371.

■■■■ The circumstances here are quite different than those found in the typical Title VII employment case. Here, children, in a developmentally critical stage of life, were sexually abused by a teacher, someone who is often a central figure in a young person's life. Once the abuse was made public, all of the Does were, at a minimum, teased about what Smith had done to them. Under these circumstances, the Court cannot conclude, as a matter of law, that the harassment was not "sufficiently severe and persistent to affect seriously [the Does'] psychological well being." *Henson,* 682 F.2d at 904.

■■■■ Thus, the plaintiffs have produced evidence sufficient to raise an issue of fact on the first four elements of plaintiffs prima facie case. There is a split among the courts recognizing this cause of action as to what more a plaintiff must prove in order to impose liability on an educational institution. Some courts have required the plaintiff to show that the institution intentionally discriminated on the basis of sex, but allowed the fact finder to draw an inference of such intent from the totality of the circumstances. See *Burrow,* 929 F.Supp. at 1203–04 (listing courts adopting similar standards). Others have held that knowing tolerance is sufficient to impose liability, *e.g. Bruneau,* 935 F.Supp. at 171. However, even among these latter courts, there remains an issue as to whether the institution must have actual or constructive knowledge of the harassment. Given all of this uncertainty (including the initial question of whether the cause of action is viable in this circuit) and the impending rehearing en banc in *Davis,* the Court finds that, the interests of justice and judicial economy would be best served by severing this claim for separate trial, pursuant to Rule 42(b) of the Federal Rules of Civil Procedure,[12] and

---

12. Rule 42(b) provides in relevant part: "The court, in furtherance of convenience or to avoid prejudice, or when separate trial will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue."

reserving ruling until such time as the Eleventh Circuit releases an opinion in *Davis*.[13]

## C. Teacher–Student Hostile Environment

■ In *Does I* the Court directed the plaintiffs to submit additional evidence to establish their prima facie case under a teacher-student hostile environment theory of sexual harassment. The elements of this prima facie case are substantially the same as the elements of plaintiffs' peer to peer hostile environment claim: (1) plaintiffs belong to a protected group; (2) plaintiffs were subjected to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment was so pervasive or severe that it altered the conditions of plaintiffs' education; and (5) some basis for institutional liability. The Court finds that plaintiffs' evidence is sufficient to establish the first four of these elements. Therefore, the Court will focus on the fifth element of plaintiffs' prima facie case, institutional liability.

■ Institutional liability may be established by demonstrating that the Board knew or should have known about the harassment and failed to take prompt remedial action. *Henson*, 682 F.2d at 905. The plaintiffs can demonstrate that the Board knew of the harassment by showing that they complained to a high ranking school official, or by showing that the harassment was so pervasive that the Board should have known. *Id.* Furthermore, where there is evidence of both quid pro quo and hostile environment sexual harassment, the Board will be charged with knowledge if it is shown that Smith's authority as a teacher aided him in sexually abusing the plaintiffs. *See Steele v. Offshore Shipbuilding*, 867 F.2d 1311, 1317 (11th Cir. 1989) ("The *Sparks* holding, however, applies only to situations in which a plaintiff is subject to both quid pro quo and hostile environment sexual harassment."); *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1559 (11th Cir.1987). Moreover, the Court notes that while these principles, derived from Ti-

tle VII cases, guide the Court's inquiry, the Court must consider the differences between an adult workplace and an educational environment when analyzing whether the Board was given sufficient notice. *Bruneau*, 935 F.Supp. at 170 ("Title VII jurisprudence is a guide, and a Court should not blindly apply Title VII to determine the issues raised in a Title IX case."). Courts cannot expect that children will be as willing or able to report sexual abuse and harassment as adults in the workplace. Thus, the Court will consider the totality of the circumstances to determine whether the Board was put on notice that the Does were being harassed.

■ Applying these rules to Does 1 and 3, the Court finds that these plaintiffs have met their burden. As noted earlier, Does 1 and 3 have presented a jury question as to whether they were the victims of quid pro quo sexual harassment. Therefore, these plaintiffs can establish, prima facie, that the Board had knowledge by demonstrating that Smith used his authority as a teacher to facilitate his abuse of these plaintiffs. The evidence produced by Does 1 and 3 clearly demonstrates that Smith used his authority to facilitate the abuse. Smith's abuse of Doe 1 frequently occurred behind the podium, in the front of Smith's classroom. Smith would call Doe 1 up to the front of the class, ostensibly to read or perform some other class activity, where Smith would fondle Doe 1 while Doe 1 stood behind the podium. Furthermore, after Doe 1 had advanced a grade and was no longer in Smith's class, Smith continued to use his authority as a teacher to molest Doe 1. Smith would regularly "send" for Doe 1; Smith would request that Doe 1's new teacher release Doe 1 from class and that Doe 1 be sent to Smith's classroom. Once in Smith's classroom, the molestation continued. The Court finds that Smith used his authority as a teacher to facilitate his abuse of Doe 1.

■ Doe 3 has testified that Smith molested him while he was watching a movie during class. While the rest of Doe 3's class-

---

13. The Court emphasizes that if, at any time prior to the start of plaintiffs' trial set for the term beginning April 7, 1997, the Eleventh Circuit releases its opinion in *Davis*, the plaintiffs

will be expected to try any viable peer-created hostile environment claims along with their other claims.

mates remained at their desks or sat on the floor, Doe 3 sat in Smith's lap, at Smith's desk. Although the inference is not as strong as in the case of Doe 1, the Court finds that one could reasonably conclude that Smith used his authority as a teacher to have Doe 3 sit in his lap, away from Doe 3's classmates, where he could perpetrate his abuse of Doe 3.

 Thus, the Court finds that Does 1 and 3 have established that the Board knew or should have known that these Does were being sexually harassed. Nevertheless, institutional liability will not attach unless the Board failed to take prompt remedial action. *Henson,* 682 F.2d at 905. "The 'remedial action' must be 'reasonably likely to prevent the misconduct from recurring.'" *Kilgore v. Thompson and Brock Management, Inc.,* 93 F.3d 752, 754 (11th Cir.1996) (quoting *Guess v. Bethlehem Steel Corp.,* 913 F.2d 463, 465 (7th Cir.1990)). However, the Court finds that the defendants have failed to present evidence which establishes, as a matter of law, that the Board took prompt remedial action. Accordingly, the Court finds that Does 1 and 3 have established a prima facie case of teacher-student hostile environment and defendants' motion for summary judgment is due to be denied.

Because Does 2 and 4 have not established a prima facie claim of quid pro quo hostile environment, they cannot rely on the theory that Smith acted with "apparent authority" to impute knowledge of harassment to the Board. *Steele,* 867 F.2d at 1317. Therefore, these Does must demonstrate that the Board had actual knowledge, or are otherwise charged with knowledge that these Does were being harassed.

 Does 2 and 4 contend that two sources provided the board with actual notice of the harassment. First, they contend that the Board was put on notice when the parents of Doe 4 complained to defendant Hol-

ley, the school principal. In a meeting with Holley, Doe 4's mother stated that she believed Smith might be abusing Doe 4. She did not, however, provide Holley with any specific examples of abuse. In a second meeting with Holley, the parents of Doe 4 again voiced their concern that Smith might be abusing Doe 4. In response, Holley allegedly told Doe 4's parents that he would keep Smith away from Doe 4. Subsequent to these meetings, Doe 4 received a birthday card and a Christmas card from Smith, each of which contained five dollars. Doe 4's parents presented these cards to Holley and again expressed concern that Smith might be abusing Doe 4.

 Second, the plaintiffs contend that the Board was put on notice when Chris Hutcheson, a board member at W.S. Harlan elementary school, "warned" Holley that he believed Smith behaved inappropriately with young boys. However, the Court finds that any such "general" warning is insufficient, by itself, to have put the Board on notice that Smith was abusing any of the Does.[14]

In *Does I,* the Court directed the plaintiffs to provide support for the proposition that notice of potential abuse is sufficient to satisfy the notice requirement. 930 F.Supp. at 570. The plaintiffs have failed to submit legal authority in support of this proposition. Despite the lack of specific legal support,[15] after careful consideration, the Court finds that actual notice of potential abuse is sufficient to establish, prima facie, that the Board had notice that the Does were being harassed. The Court does not believe that an educational institution should be absolved of liability simply because a parent fails to wait until he or she has concrete evidence of abuse to report to school authorities. Sexual abuse and harassment should be detected and halted at the earliest possible opportunity, preferably before it occurs.[16] According-

---

14. *But see* note 17 *infra.*

15. The Court notes that while plaintiffs have failed to offer legal authority in support of their position, defendants have similarly failed to provide legal authority for their contention, that notice of potential abuse is insufficient as a *matter of law.* Defendants' position is not estab-

lished simply by the absence of authority to the contrary. Rather, the issue is one which, at this time, has not been squarely addressed.

16. This is not to say that a school's reaction to a report of potential abuse could not differ significantly from a report of actual abuse. As noted above, an educational institution is liable for

ly, the Court finds that Doe 4 has presented evidence sufficient to establish that the Board was on notice that he was being abused by Smith.

While the report of potential abuse by Doe 4's parents is sufficient to put the Board on notice that Doe 4 was being harassed, it does not put the Board on notice that Doe 2 was being harassed. Defendants correctly point out that each plaintiff must, independently, establish his prima facie case. *See Alexander*, 459 F.Supp. at 3–4. However, Doe 2 contends that because the harassment was so severe and pervasive, the Board was put on constructive notice that he was being harassed.

 Doe 2 has submitted evidence indicating that Smith molested him on four or five occasions. Two of these incidents occurred at school, one in Smith's classroom, the other in the restroom. The remaining incidents occurred away from school, and there is no evidence that the Board knew or could have known that they occurred. The Court finds that the abuse of Doe 2, considered alone, was not sufficiently pervasive to put the Board on constructive notice. Smith did, however, molest the other Does, particularly Does 1 and 4, frequently on school property. This abuse took place during the same time period that Smith was molesting Doe 2. While evidence that Does other than Doe 2 were frequently abused on school property may not, by itself, be sufficient to put the Board on notice, the Court will consider such evidence when assessing the totality of the circumstances to determine whether the Board was on notice.

Doe 2 further contends that, because of the Board's noncompliance with Title IX, the Board should be estopped from denying that it was on notice. Although the defendants argue that they have complied with Title IX's procedural requirements, the Court found earlier that there is a question of fact as to whether the steps taken by the defendants comport with the mandate of Title IX to provide for prompt and equitable resolution of student complaints. 34 C.F.R. § 106.8(b).

Construing all factual inferences in the light most favorable to the plaintiffs, as the non-moving party, the Court will discuss plaintiffs' contention using the presumption that defendants have failed to comply with Title IX's procedural requirements. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

In *Meritor Savings Bank v. Vinson*, the Court discussed the standard for employer liability under a hostile environment theory. The Court noted that the Equal Employment Opportunity Commission ("EEOC") suggested a rule that held "the employer [ ] liable if it has actual knowledge of the harassment or if, considering all the facts of the case, the victim in question had no reasonably available avenue for making his or her complaint known to appropriate management officials." 477 U.S. at 71, 106 S.Ct. at 2407–08. The Court, citing gaps in the factual record, declined to decide whether the EEOC's suggested rule was the proper standard for employer liability. *Id.* Nevertheless, in *Cross v. State of Ala.*, 49 F.3d 1490 (11th Cir.1995), the Court of Appeals for the Eleventh Circuit appears to have adopted the EEOC's suggested rule of liability. The *Cross* Court stated:

> [T]he *[Meritor]* Court makes clear that in cases where the employer has actual knowledge of the harassment, or the "victim in question" did not have a reasonable avenue for making his or her complaint known to appropriate management officials, the employer is not shielded from liability because the complainant did not give notice of the activity.

*Id.* at 1506 (citation omitted). And in *Splunge v. Shoney's Inc.*, 97 F.3d 488, 490 (11th Cir.1996), the Eleventh Circuit reaffirmed this rule: "Shoney's cannot complain about its lack of notice: a reasonable jury could find that Shoney's sexual harassment policy was never communicated to Plaintiffs."

 In accordance with the above decisions, and in light of the special problems related to "speaking up" about sexual harass-

---

hostile environment sexual harassment only if it fails to make a prompt remedial response once it has knowledge of the harassment. A school need only respond reasonably to a threat of potential abuse to avoid liability.

ment when it occurs in an elementary school setting rather than an adult workplace, the Court finds that if defendants failed to comply with Title IX's requirement to develop and publish an adequate grievance procedure, then defendants cannot avoid liability by claiming that they did not have notice of the harassment. For purposes of this summary judgment motion, the Court presumes defendants did not develop and publish an adequate grievance policy. Therefore, the Court finds that defendants are estopped from claiming that they lack notice that any of the Does were being harassed.[17] Accordingly, the Court finds that defendants' motion for summary judgment on plaintiffs' Title IX teacher-student hostile environment claims is due to be denied.

## II. State Law Claims

The plaintiffs originally asserted four state law causes of action: (1) sexual abuse and harassment; (2) outrage; (3) negligence; and (4) sexual assault. In *Does I,* the Court found that the Board and the individual defendants, in their official capacities, were entitled to sovereign immunity pursuant to Art. I, § 14 of the Alabama Constitution. 930 F.Supp. at 579–80. The Court reserved the issue of whether the defendants, in their individual capacities, were protected from suit under the doctrine of "discretionary immunity." Following *Does I,* plaintiffs amended their complaint to add a fifth state law cause of action—fraud and bad faith. The Board and the individual defen-

dants, in their official capacities, are entitled to absolute sovereign immunity and thus, are similarly immune to plaintiffs' fifth state cause of action.

Individuals, who act as state agents,[18] are protected by the state's sovereign immunity if the act complained of was committed while that individual was performing a discretionary function. *L.S.B. v. Howard,* 659 So.2d 43, 44 (Ala.1995); *Faulkner v. Patterson,* 650 So.2d 873, 874 (Ala.1994). Discretionary functions include:

> those acts as to which there is no hard and fast rule as to course of conduct that one must or must not take and those requiring exercise in judgment and choice and involving what is just and proper under the circumstances.

*Id.* (quoting *Black's Law Dictionary,* 467 (6th ed.1990)) (internal quotation omitted).[19] While this immunity serves as a shield against liability for negligence or wantonness, it will not protect the individual from liability if there is evidence of fraud or bad faith. *Hill v. Allen,* 495 So.2d 32, 34–35 (Ala.1986). For this reason, the Court will address plaintiffs' first four state causes of action separately from their fifth claim, their claim of fraud and bad faith.

### Claims I, II, III, and IV

Plaintiffs first argue that defendants were not performing a discretionary function. Specifically, plaintiffs assert that defendant Holley, the school principal, had a duty to

---

17. Alternatively, the Court finds that the lack of an adequate grievance procedure together with the other evidence presented by the plaintiffs, Chris Hutcheson's warning, the complaints of Doe 4's parents, and the pervasive harassment of the Does as a group,(which the Court has already found was insufficient standing alone to provide the Board with notice) is, in the totality of the circumstances, sufficient to charge the Board with knowledge that Doe 2 was being sexually harassed.

18. Unlike the Eleventh Amendment immunity analysis discussed *supra,* county boards of education are considered an arm of the state for the purpose of state sovereign immunity analysis. *C.B. v. Bobo,* 659 So.2d 98, 101 (Ala.1995).

19. In *Phillips v. Thomas,* 555 So.2d 81 (Ala. 1989), the Alabama Supreme Court stated that

the following factors may be considered in determining what is a discretionary function:

> [1] the nature and importance of the function that the officer is performing; [2] the extent to which passing judgment on the exercise of discretion will amount necessarily to passing judgment on the conduct of a coordinate branch of government; [3] the extent to which the imposition of liability would impair the free exercise of discretion by the officer; [4] the extent to which the ultimate financial responsibility will fall on the officer; [5] the likelihood that harm will result to members of the public if the action is taken; [6] the nature and seriousness of the type of harm that may be produced; and [7] the availability to the injured party of other remedies and other forms of relief.

555 So.2d at 84 (citation omitted)

investigate after the mother of Doe 4 spoke with Holley regarding her concerns about Smith. While plaintiffs admit that Holley retained some discretion over the manner and method of the investigation, they contend that Holley did not have discretion over whether or not to make an investigation. Plaintiffs contend that this mandatory duty was imposed on Holley by federal law under Title IX and by defendants' grievance policy.

■ Defendants dispute that Holley had any such duty and/or that the duty was triggered by the complaints of Doe 4's mother. However, assuming arguendo that the plaintiffs are correct in asserting that Holley had a non-discretionary duty to respond to the complaints of Doe 4's mother, the Court finds that Holley performed this duty. The defendants have presented evidence that, after receiving the complaint of Doe 4's mother, Holley spoke with Smith about the complaint. While Holley's response may have been inadequate and insufficient, the Court finds that Holley did in fact respond to the complaint, and thus, satisfied the mandatory portion of the duty with which he was charged. *Cf. Phillips v. Thomas,* 555 So.2d 81, 86 (Ala. 1989) (alleged failure to correctly answer yes or no question as to whether pool was enclosed by fence precludes application of discretionary immunity doctrine).

■ Plaintiffs do not point to any similar mandatory duty breached by the remaining individual defendants. Instead, plaintiffs claim that defendants do not have immunity for their willful and malicious acts or that defendants were acting outside the scope of their authority. Plaintiffs are correct in their assertion that a defendant who acts with malice, intent or bad faith cannot claim discretionary immunity. *McMillian v. Johnson,* 88 F.3d 1554, 1572 (11th Cir.1996). However, the mere allegation of such conduct will not strip the defendants of their immunity; the allegation must be supported by the evidence. *L.S. B.,* 659 So.2d at 45; *Hill,* 495 So.2d at 33–35. Here, plaintiffs have failed to produce any evidence from which a reasonable person could conclude that the defendants acted intentionally, maliciously, or in bad faith.

■ Plaintiffs' claim that defendants were acting outside the line and scope of their employment (and thus, not as agents of the state) is similarly unfounded. Plaintiffs complain that their injuries were caused by defendants' failure to create and disseminate a sexual harassment and grievance policy, as well as defendants' failure to investigate and respond to complaints of sexual harassment. Clearly, plaintiffs are relying on the action (or inaction) taken by the defendants in the line and scope of their employment. It is only within the scope of defendants' employment that they could have accomplished the tasks which plaintiffs claim would have prevented their injuries.

This case is very similar to several cases in which the Alabama Supreme Court has held that school officials were entitled to discretionary immunity. In *C.B. v. Bobo,* 659 So.2d 98 (Ala.1995), several students were sexually abused by their teacher. The students sued the school principal, superintendent, and school board members alleging that the defendants knew of the teacher's propensity for abuse, that the defendants had received complaints about the teacher's actions, and that the defendants had failed to take any action to prevent the abuse from occurring. *Id.* at 101. The court held that whatever action the defendants should have taken was discretionary and that the doctrine of discretionary immunity was applicable. *Id.* Similarly, in *Hill, supra,* the student plaintiffs alleged that they had been abused by their instructors and that the school official defendants had acted negligently, wantonly and intentionally by allowing the abuse, which the defendants knew was occurring, to continue. The court held that the defendants were entitled to discretionary immunity. 495 So.2d at 34–35. Finally, in *L.S.B., supra,* the plaintiff sued her school principal for negligent supervision after the plaintiff was allegedly raped by one of her classmates. The court noted that supervisory functions are usually discretionary and affirmed the lower court's finding that the principal was protected by discretionary immunity. 659 So.2d at 44.

The Court finds that the defendants in this case were within the line and scope of their

employment and were engaged in discretionary activities at the time the plaintiffs were injured. All the activities of which the plaintiffs have complained (inadequate promulgation and dissemination of harassment and grievance policies and inadequate response to complaints of sexual harassment) are activities which required the exercise of judgment and choice as to the proper course of conduct under the circumstances. Further, the Court finds that the plaintiffs have not produced evidence that the defendants acted willfully or in bad faith. Accordingly, the Court finds that the defendants are entitled to discretionary immunity, and the defendants' motion for summary judgment on plaintiffs' sexual abuse and harassment, outrage, negligence and sexual assault claims is due to be granted.

### Fraud and Bad Faith

The plaintiffs amended their complaint to add the following allegation:

33. The defendants are liable for their misrepresentations to the plaintiffs that the plaintiffs' complaints would be investigated and that the teacher's conduct would be stopped. The representations were not true when made or alternatively were abandoned once made and were relied on to the subsequent injury of the plaintiffs. The defendants' conduct in failing to investigate complaints of sexual abuse, and in failing to fulfill their affirmative undertaking to investigate complaints of sexual abuse, were relied upon to their detriment by the plaintiffs, constitutes fraud and bad faith and hence the defendants' conduct is not protected by the doctrine of discretionary function immunity under Alabama law.

Plaintiffs, in their brief on state law causes of action, appear to ground their fraud claim on several factual theories. First, plaintiffs claim defendants acted fraudulently in certifying to the Alabama Department of Education that they were in compliance with Title IX. Second, plaintiffs assert that defendants provided fraudulent documents to an outside agency which certified defendants' compliance with Title IX. Third, plaintiffs

contend that amongst the evidence submitted to this Court, the defendants have included documents fraudulently attesting to their compliance with Title IX. Finally, plaintiffs contend that, after Doe 4's parents allegedly complained to defendant Holley about Smith, Holley falsely represented to the parents of Doe 4 that he would keep Smith away from Doe 4, and thus, induced the parents of Doe 4 to rely on Holley to prevent any further incidences of abuse.

■■■ Of these four factual theories of fraud, the Court finds that only plaintiffs' final theory lies within the scope of the fraud allegation contained in the complaint. In accordance with the heightened pleading requirement placed on the plaintiffs under Rule 9(b) of the Federal Rules of Civil Procedure,[20] the Court will not consider plaintiffs' allegations of fraud which lie outside the scope of the complaint. *See Mays v. United Ins. Co. of America,* 853 F.Supp. 1386, 1389 (M.D.Ala.1994) (citing *Robinson v. Allstate Ins. Co.,* 399 So.2d 288, 290 (Ala.1981)) (To state fraud claim, "[t]he pleader must state the time, the place, the contents or substance of the false representations, the fact misrepresented, and an identification of what has been obtained.")

■■■ Under Alabama law, to establish a claim for fraudulent misrepresentation, the plaintiff must show that,

whether the defendant acted willfully, recklessly, or mistakenly, there must be (1) a false representation, (2) which concerns a material existing fact, and (3) the plaintiff must rely on that false representation, and (4) the plaintiff must be damaged as a proximate result.

*Walker v. Norden,* 461 So.2d 1312, 1314 (Ala. 1984); § 6–5–101 Ala.Code (1975). The defendants contend that plaintiffs have failed to produce evidence demonstrating that Holley made a false representation to the plaintiffs, specifically to the parents of Doe 4. Exactly what Holley told the parents of Doe 4 is a matter of some dispute. If, as the parents of Doe 4 attest, Holley told them he would keep

---

**20.** Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.

Malice, intent, knowledge, and other condition of the mind of a person may be averred generally."

Smith away from Doe 4, such representation clearly proved to be false. Exs. L, M, attached to Pl.'s June 3, 1996, submission.[21]

Defendants also contend that plaintiffs have failed to introduce evidence indicating plaintiffs relied on Holley's statement. However, the Court finds that a reasonable person could infer that the parents of Doe 4 relied on Holley's statement by allowing Doe 4 to return to school and entrusting his safety to the school officials. Further, the Court finds that the alleged representation was clearly material and that there remains a question of fact as to whether Holley's statement proximately caused Doe 4's injuries. Accordingly, the Court finds that as to all individual defendants except Holley, defendants' motion for summary judgment on Doe 4's state fraud/bad faith claim is due to be granted; as to Holley, defendants' motion is due to be denied. As none of the other Does have produced evidence indicating that Holley made any misrepresentation to them, defendants' motion for summary judgment on Does' 1, 2 and 3, state law claims for fraud/bad faith is due to be granted.

## CONCLUSION

In accordance with the foregoing discussion, it is CONSIDERED and ORDERED that:

(1) defendants' motion for summary judgment on plaintiffs' quid pro quo hostile environment claim is GRANTED as to Does 2 and 4, and is DENIED as to Does 1 and 3;

(2) defendants' motion for summary judgment on plaintiffs' teacher-student hostile environment claim is DENIED;

(3) plaintiffs' claim for relief based upon defendants' failure to comply with the procedural requirements of Title IX, specifically 34 C.F.R. §§ 106.8 and 106.9 is DISMISSED;

(4) plaintiffs' claim for relief under a Title IX peer to peer hostile environment theory is SEVERED and ruling is RESERVED until such time as the Eleventh Circuit Court of Appeals issues a ruling in *Davis;*

(5) defendants' motion for summary judgment on the grounds of discretionary immunity is GRANTED as to plaintiffs' state law claims for sexual abuse and harassment, outrage, negligence, and sexual assault; and

(6) defendants' motion for summary judgment on plaintiffs' state law claim for fraud and bad faith is GRANTED as to Does 1, 2, and 3, GRANTED as to Doe 4's claim against the Board, the Board members and Superintendent Odom, and DENIED as to Doe 4's claim against defendant Holley.

---

21. While Doe 4's mother's affidavit testimony differs somewhat from the deposition she had given previously, the Court finds that the affidavit testimony is not inherently inconsistent with the deposition testimony, and thus, may be relied upon by the Court. *See W.C. Lane v. Celotex Corp.,* 782 F.2d 1526, 1531 (11th Cir.1986); *see also Moore v. Beneficial National Bank U.S.A.,* 876 F.Supp. 1247, 1253–54 (M.D.Ala.1995).